This morning is 4-18-05-74. Wagner v. Department of Commerce and Economic Opportunity, et al. The appellant is Mr. Baker and for the appellee is Ms. Quinn. Okay, Mr. Baker, you may proceed, sir. Thank you, Your Honor. Good morning. May it please the Court. Counsel. My name is James Baker. I'm appearing this morning on behalf of Mr. Wagner. In June of 2010, Mr. Wagner became employed by the Department of Commerce and Economic Opportunity as a manager of its OSHA program. He reported directly to Jill Merber, the deputy director of that department. In late August or early September of 2010, Mr. Wagner received a probationary evaluation in which he was rated deficient in each of the performance criteria. Shortly thereafter, he went on a medical leave of absence and never returned to the department. He was terminated from employment with the department in June of 2011 based upon that evaluation. Mr. Wagner's case is maintained under the provisions of the whistleblower section of the State Employees Ethics Act. In this case, after a bench trial, the circuit court made three determinations. The first determination was that Mr. Wagner had indeed engaged in protected activity. The second determination was that there was a connection between the protected activity, his substandardization, and eventual termination. Mr. Wagner had the burden of proof in each of those propositions by the preponderance of the evidence. It was the third criteria that brings us to this court. As the court concluded that the defendants had fulfilled their burden of showing that even had Mr. Wagner not engaged in protected activity, he still would have been terminated. Under the Ethics Act, the defendants bore the burden of proving that proposition by clear and convincing evidence. The primary issue that brings us to this court is whether the circuit court's conclusion on that point is contrary to the manifest way to the evidence. Now, I understand and accept the proposition that the manifest way to the evidence standard is deferential. However, deference is not unlimited. I think the one area that the appellees and Mr. Wagner can agree upon in this case is that there is not a great deal of judicial authority interpreting the Ethics Act. And courts have borrowed from the federal counterpart to the Ethics Act, which contains identical proof burdens, and the cases that interpret that. And those cases teach us several things that I think are pertinent to this appeal. Firstly, I think this is Miller versus Department of Justice, said that in reviewing at the appellate level the question of whether the same conduct would have occurred, you need to be mindful of the proof burden the parties had in the trial proceeding. The second thing is there are several cases on this point that say in determining whether the manifest way to the evidence standard has been satisfied, you cannot look at only evidence that supports the conclusion of the decision maker, but also have to look at evidence that goes the other way. In other words, you have to consider the evidence in the aggregate. Is there any reason to suggest, much less conclude, that the trial judge in this case heard all these witnesses, didn't comply with that statement? There is. Tell us what that is. I'm about to get to that. The circuit court concluded, and its ultimate conclusion was that Mr. Wagner was disobedient, insubordinate in his 90 days at the department. And the true first point it relies upon is its conclusion that he went out of his way to endear himself to the Department of Labor at the risk of avoiding his responsibilities to HECIA. There is absolutely no evidence of that in the record. The only testimony concerning Mr. Wagner's interrelationship with the Department of Labor officials came from Mr. Wagner. No one else testified concerning any conversations, any verbal interactions. What Mr. Wagner says, and it's not disputed, is that he dealt regularly with a man named Robert Murphy, who is the Department of Labor liaison. And he would speak frequently with Mr. Wagner concerning program activities. When Mr. Wagner asked him, or when Mr. Murphy asked him questions, he answered those questions. And he felt he had an obligation to answer them truthfully. And some of the answers he gave concerning the lack of movement on the part of HECIA in fulfilling some of its regulatory requirements did not reflect well on either Ms. Merber or HECIA. Who initiated these conversations? Beg your pardon? Who initiated the conversations, Mr. Wagner or Mr. Murphy? Not necessarily either. They would come up periodically. Mr. Murphy monitored the program. He, from time to time, would call Mr. Wagner. Mr. Wagner, from time to time, would have questions, and he would contact HECIA. It was some of each. The second. Well, this is an inference that the trial court drew from this conversation, discussion. It seems to me, to disregard it, we'd have to conclude that it was an unreasonable inference. Is that your claim? That's part of it. Okay. What else is there that the trial court misconstrued or was simply wrong on in its conclusion with regard to what happened? I have a list of things. Go ahead. The second thing was that the court determined that Ms. Merber was merely annoyed with what Mr. Wagner was reporting to the Department of Labor because the department already knew that. And in this case, the evidence is that what Mr. Wagner was reporting to the Department of Labor was a continuing practice on the part of DECU not to bring the program into compliance with federal regulations after Ms. Merber had promised that it would. But that's point one. Second point is that on at least six occasions during the relevant time period, Ms. Merber reported her concerns or her chain of command that Mr. Wagner was making comments to the Department of Labor that reflected poorly on him. The third thing was, based upon… Was that what she testified to? That's what the documents reflect, which are in evidence. There are a series of emails between August of 2010 and December of 2010 by Ms. Merber to her superiors where she makes these continuing comments. The third point is that both in the documents that are in evidence and also in Ms. Merber's testimony, she indicated a belief that Mr. Wagner was attempting to get her fired. Now, I suggest that all of that evidence, none of which was discussed by the court in its opinion, suggests that this was more than a mere annoyance on the part of Ms. Merber. Third point is… Well, how does this affect the trial court's ultimate conclusion that the state agency would have taken the same unfavorable personnel action in the absence of the productive conduct? All of this suggests that she was upset with Mr. Wagner's behavior in going to the Department of Labor more than anything else. But I'm not finished yet. Well, but pausing right there, the question is, would the state agency have taken the same unfavorable personnel action? And what you seem to be saying is, Merber might have done it, but she shouldn't have. That's not the question for the trial court, is it? What I'm saying is, the court said, I don't think she would have done it because she was just annoyed. This was not a big deal to her. That was what one of the positions relied upon by the circuit court in coming to its conclusion. And the evidence is this was not a minor annoyance. It was much more than that. The third point is that the court concluded that Mr. Wagner was a serial violator of state procurement policies and had even purchased a car and goggles and shoes without following procurement policies. There was in this case the testimony of a woman named Anita Patel, who was the chief financial officer of Bekio. We talked about Mr. Wagner and his activities when it came to procurement matters. She didn't indicate that there was any purchase of a car. What she did say is he violated those policies when he purchased safety shoes and glasses for himself without getting authorization. But that occurred in September of 2010 after the evaluation. What she also said in cross-examination was that it is common for rookie program managers not familiar with procurement policies to have a lot of questions, to have a lot of frustrations. Sometimes to stub their toes in dealing with procurement issues. That's not unusual. She further testified that although Mr. Wagner questioned policies, he followed them. And the only time he didn't was with respect to the purchase of shoes. So what I'm saying is there's little in the way of evidence that Mr. Wagner was willfully disobedient in not following state procurement policies. Counsel, you seem to, let me be more clear on this, you seem to be equating two things that aren't the same. The question you seem to be arguing is there was no justification to fire Mr. Wagner. And the trial court should have found that there was no justification to fire Mr. Wagner. But that's not the issue under this statute. The question is did the state present clear and convincing evidence that the state agency would have taken the same unfavorable action, notwithstanding the absence of this protected conduct. And it seems you haven't addressed that at all. Namely, the state agency determined we're going to fire this guy. And the question is, for the trial judge, is that what the evidence showed they would have done? Certainly to get to that point, one has to examine Mr. Wagner's conduct, actually his performance. That becomes relevant. The second thing that has to be examined is the credibility of the explanations given for not terminating him. And they claim that he was a local violator of procurement policies. The evidence is that's not the case. That's not the case that creates a credibility issue that is unresolved in this case. So this was a pretext, your claim, that they wouldn't have fired him no matter what. This was all a pretext. Partially, yes. And the trial court was taken in by the pretext. Well, the trial court relied upon things to support the justification, which just is not borne out by the evidence. Well, you say that the shoes and glasses were purchased after the evaluation. Yes. Does that matter? It still was an admission by your client that he didn't follow the procurement procedures. It matters for this reason. He was fired based upon the comments in the evaluation. And at the time the evaluation was done, the shoe and glasses issue did not occur. The next point that the trial court relied upon is that another employee in the OSHA program, a woman named Micah Chinnis, was treated poorly by Ms. Meriburg, but there was no evidence that Micah Chinnis had done anything to go to the Department of Labor. And the evidence in this case is that Ms. Meriburg, in terms of e-mails she wrote to her chance command, which is in the record, believed Micah Chinnis went to the Department of Labor. She also testified in trial that she believed Micah Chinnis was out to get her fired as well. So there was evidence. She viewed Micah Chinnis as someone who was engaging in this protected activity as well. Now, the distinction between Mr. Wagner and Ms. Chinnis is Mr. Wagner was a probationary employee who had no employment protections. Ms. Chinnis was not a probationary employee. She'd been around a long time, and she had the benefits of union protection. The next thing the court said was that Mr. Wagner was guilty of misrepresenting to the Department of Labor deputies' efforts in filling a safety supervisor position. And there's no evidence of that in the record. At the time he started, Ms. Meriburg and he disagreed about the need to fill that position. In August, that disagreement was still ongoing. On August 6th, Mr. Wagner indicated that he felt the program was not being served because there was not someone in that position. They had another email exchange on August 12th where Ms. Meriburg said we're still not on the same page. It was not until September of 2010, after the evaluation and shortly before Mr. Wagner left active employment with the Department, that that position was filled. Ms. Meriburg, and the court relied on this, claimed that Mr. Wagner was not doing what he needed to do to learn the OSHA program. And her allegations in that respect were very nonspecific. The evidence in this case is that Mr. Wagner, during his first 90 days, worked day in and day out with Ms. Chunas, who had been with the Department in the OSHA program for many years, was an executive in that program, and for a year had been the acting program manager. And Ms. Chunas, in her testimony, spoke in detail about Mr. Wagner's efforts, not only as an employee, but also in learning the program. The court ignored that evidence in its entirety. The court went on to say that Ms. Meriburg was less than impressed with Mr. Wagner's efforts in preparing a report for the Department of Labor, which was due at the end of the first month he was on the job. Now, she doesn't say what he did wrong, she doesn't identify what the problems were with his work product. What is clear is that Mr. Wagner had three weeks to prepare that plan once he became aware that it was due. He was a rookie in the department, had no prior experience. He was able to submit a plan which was timely and was approved by the Department of Labor. All of that is in the record, but was ignored by the court. How do you know it was ignored by the court? Beg your pardon? How do you know that? The court wrote the 16-page opinion, and so if it doesn't discuss all the evidence, it ignored it, or wasn't aware of it? Well, it's apparent from being familiar with the evidence received at trial. And, of course, what it wrote, and I can only go on the written word in its opinion, that it certainly did not appear to consider these things. So, when the court, does this court the favor of writing a written opinion explaining its decision? If it doesn't include all the evidence that was presented, that means it ignored it, or wasn't aware of it? Well, if we go back to what the proof burden is. How about answering my question? What I'm attempting to do. So is the answer yes or no? Beg your pardon? Is the answer to my question yes or no? The answer to your question is I think it has an obligation to recite and speak to all the relevant evidence. Where does that requirement appear in the law? We cited the Whitmer case, which indicates that the court has to consider all evidence. You just said the court has to state it in its written decision, or we're going to conclude that it didn't consider it. I can't look into the mind of the trial judge. I can only go by what's in its opinion. Well, but actually when you say the court didn't consider it, you're looking into the mind of the trial judge, aren't you? Well, I don't think so. What I'm attempting to do is to say I'm relying upon what he says. And what he said, in many respects, is just not supported by the evidence. Your time's up, Mr. Baker. You have an opportunity to address this together in rebuttal. Thank you. Ms. Quinn? Counsel? The circuit court ignored the known testimony in this case. In its 16-page memorandum of opinion, it explicitly states that it considered all the evidence and made credibility determinations based on its consideration of all the evidence. So there's no case law out there that says if it failed to mention something, it failed to consider it? I'm not aware of none of it. And the court says that they were giving examples of the evidence it considered. But it is the inference that one draws from what the court wrote is it considered everything. And it gave some illustrative examples. It wasn't obligated to detail every piece of evidence that it had listened to and say, yep, no, yep, no, this is credible, that's not credible. We don't require those circuit courts. In arriving at its judgment, the circuit court credited the testimony of DCEO management that Mr. Wagner was argumentative, insubordinate, and that his work in some cases was deficient. And those credibility determinations were the circuit court's to make. And they have plenty of support in this record. As the court noted, it is apparent that Mr. Wagner had expectations for how decisions, including decisions on expenditures, were going to be made. And it was not lost on the court that Mr. Wagner sought to prevail in discussions that he had with his supervisor. He stated as much during trial. Now, surely everybody in this room understands how emotionally satisfying it is to win arguments on principle. But in carrying out our responsibilities to our clients, to our employers, to the public at large, sometimes we have to put our own emotional needs aside and do what is necessary to get the job objectives accomplished. And that is what Marburg expected Mr. Wagner to do. She was able to do it in certain circumstances. In order to get certain expenditures approved, like travel, for example, she needed documentation from him that those expenditures were considered mandatory and or necessary by the Federal Department of Labor. And what did she do? She picked up the phone. She called Mr. Murphy. She got a letter saying, okay, upcoming travel. You need to do it. It's necessary. How hard would that have been, really, for Mr. Wagner to do? I mean, when she interviewed Mr. Wagner, during the job interview, she said, I need a strong manager. I need somebody who can handle this program. She wasn't looking to micromanage anybody. She wasn't looking to micromanage anybody. She was looking to get the job done. And this would have been an easy way to do it. She did the same thing with the medical evaluations. Again, she got a letter dated the same day saying, really, these are necessary. These are requirements. You have to do them. That was what was necessary to move those expenditures forward. The act was relatively recent, and there is no legal case law that even references it. But we do take guidance from the federal law. And the state metrics act says that if someone who is disclosing reasonable beliefs that what they are disclosing is a violation of a law, a regulation, that conduct is protected. But the standard isn't a reasonable one. So we're at other times. I mean, basically, false information is not protected. And information that someone should reasonably know is false, is not protected. And it is in the firm's position that you cannot be in email traffic, for example, on the medical evaluations, and conclude that Ms. Milberg was trying to disrupt it. She wasn't. She was asking them to supply her with what she needed in order to move the approval process forward. Were it otherwise, her false disclosures or disclosures that one reasonably should know are false were protected. There would be perverse incentives and unjust results. Now, Mr. Wagner doesn't dispute that DCL correctly cites federal law on that point. But he does argue that the federal department of labor was unaware of Mayorberg in particular, Mayorberg's unwillingness. He says that in his reply to the three and four. It was her unwillingness to approve the expenditure of funds for the medical evaluations. But to the extent that he sought to blame her for that, and he continued to do so right through trial, he was supplying the federal liaison with misinformation. And if you look at the audit from 2007-2009, and there's a lot of repetition in this record, so it appears in at least two places. E-28 and supplemental E-28. The department of labor was fully aware that these medical evaluations had not been approved yet. They were ongoing issues since at least 2007. What Wagner now claims to have provided is the new information that Mayorberg's account attracts, preventing it from going forward. And the department sees that his basis for that claim, the e-mail chain, completely lies his assertion. And he may have truly subjectively believed what he was saying to the department of labor. But the standard is a reasonable person's standard. And the department submits that there's not a single soul in the top amount of us who have read that e-mail traffic and decided that she was the one obstructing. She needed documentation to move it forward. And to be clear, this argument is not an attack on the court's judgment in any respect. It is simply an alternative ground that this court could rely on to sustain it. And because the department, like this court, has an interest in there being a comprehensive, coherent body of law on the subject. I can answer any questions the court has about the record. But honestly, this case turns on a fairly heavily factual record. And I could talk for hours about it, but I don't want to waste the court's time, do you? Counsel, let me ask you this. It appears from my reading of this that the obvious, Mr. Wagner is on probation. During that probationary period, it becomes clear he can't get along with Ms. Merberg. And therefore, it follows that Mr. Wagner was not retained because he couldn't get along with Ms. Merberg. And that would have happened regardless of the communications of Mr. Murphy. Is that kind of the... That kind of is it. Or is that too simplistic? Well, no, but it leaves out that there were other people in the department with whom he couldn't get along. He seemed irritated at the chief financial officer. He's right there in e-mails lecturing her on what her responsibility was to the state of Illinois. And what he presumed that the record's intent was in approving the ocean budget. He consistently questioned policy, tried to go around policy. And he explicitly testified that he was aware that the procurement rules existed, but he'd never seen one. And Anita Patel, who was the chief financial officer for the department, testified that it was a big part of the program manager's job to monitor expenditures. So to the extent that he could not be bothered to even look. And he says, they were policies. I was told they existed, but I'd never seen them. That's not sufficient. Okay? And it's also interesting. I was reading a testimony last night, and I read it. Mika Chinnis, who was acting program manager for about a year, she was explicitly asked her in trial, are you familiar with the procurement code? Her answer, very little. I know it exists. So that's who he was conferring with. That's who was helping train him, getting him up to speed on his job. And even she didn't familiarize herself with the procurement code. So it's more than just Jill Merger, Your Honor. It is a number of the other management and the CEO was dissatisfied with his performance. See nothing else, counsel? Thank you, Your Honor. I understand that.  Any rebuttal, sir? I'd like to speak to the medical evaluations counsel referred to a moment ago. Okay. Which he says is not consistent with the record in this case. Under the OSHA program, there's a regulation requiring consultants to have both parent protection and respiratory protection. And in order to have that protection, the consultant has to go through some testing. Okay. On Mr. Wagner's second day on the job, Ms. Merberg and he met with Mr. Murphy to go through the DECIO, the Department of Labor Report Concerning Program for a two-year time period. That identifies I think exhibit four. And on page seven of that document, it explains what is required with respect to hearing and respiratory protection. And it specifically talks about respiratory testing and audiometric testing. So Ms. Merberg claimed during the fall of 2010, well, Mr. Wagner never told me what was required. She knew what was required because of what was in the report, what was discussed. The second thing is she claimed she didn't know until October. In June of 2011, when that program was transferred out of DECIO, she had still done nothing to fulfill the requirements of that federal regulation. What Mr. Wagner was doing in his reports to Mr. Murphy and answering his questions was truthfully indicating that notwithstanding the Department of DECIO's obligation, nobody had promised the Department, no steps had been taken to implement these particular protective requirements. She also alludes to Mr. Wagner going around procurement policies and cites Ms. Patel. And I'm kind of repeating myself, but I would ask the court to review Ms. Patel's testimony. But it got right down to it. She said that Mr. Wagner may have questioned the policies and disagreed with them, but he didn't go around it. He attempted to comply with them. It is true that Ms. Merberg indicated during this interview that she wanted a straw manager. And the evidence in this case is that's what Mr. Wagner attempted to do. He attempted, among other things, to bring the program into regulatory compliance. If one examines the evidence in comparison with what the findings are of the circuit court, I submit that the defendants did not fulfill their burden of producing clear and convincing evidence that he would have been terminated if he had some disprotected activities. Thank you, counsel. I take this matter under advice and will be in recess for a few moments.